John Buse (CA Bar No. 163156)
Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Telephone: (510) 844-7100
Fax: (510) 844-7150
jbuse@biologicaldiversity.org
lbelenky@biologicaldiversity.org

Jason Weiner (CA Bar No. 259264)
Wishtoyo Foundation
9452 Telephone Road #432
Ventura, CA 93004
Telephone: (805) 823-3301
Email: jweiner.venturacoastkeeper@wishtoyo.org

Attorneys for Plaintiffs

(*additional counsel on next page*)

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WISHTOYO FOUNDATION, DELIA DOMINGUEZ, and CENTER FOR BIOLOGICAL DIVERSITY**<br><br>Plaintiffs,<br><br>**v.**<br><br>**UNITED STATES FISH AND WILDLIFE SERVICE,**<br><br>Defendant. | ) Case No. 2:19-cv-3322<br>)<br>)<br>)<br>)<br>)<br>)<br>) **COMPLAINT FOR**<br>) **DECLARATORY AND**<br>) **INJUNCTIVE RELIEF**<br>)<br>)<br>)<br>) |

*Additional counsel:*

John Rose (CA Bar No. 285819)
CENTER FOR BIOLOGICAL DIVERSITY
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
Telephone: (213) 785-5400
Fax: (213) 785-5748
jrose@biologicaldiversity.org

# INTRODUCTION

1. The California condor is one of the most imperiled animals on the planet. After four decades of protection as an endangered species, an unprecedented captive breeding program, implementation of California legislation banning lead bullets, and continued feeding and management efforts, California condors are mounting a gradual recovery, but remain critically endangered in 2019.

2. The condor's decline has had a marked impact on native peoples in central California, in particular the Kitanemuk and Yowlumne Tejon and Chumash—tribes with ancestral lands in the condor's historical range. The condor is of tremendous religious and cultural significance to these tribes and the decline of the species has contributed to their inability to perform essential religious ceremonies and cultural practices.

3. The condor now faces a threat from the very agency tasked with protecting it—the U.S. Fish and Wildlife Service (the "Service"). In 2013, the Service approved the Tehachapi Uplands Multiple Species Habitat Conservation Plan ("TUMSHCP"), which authorizes large-scale development on thousands of acres that the Service previously designated as critical habitat for the condor at Tejon Ranch in Kern County, California. In connection with its approval of the TUMSHCP, the Service issued an Incidental Take Permit ("ITP") allowing the "taking" of California condors under the Endangered Species Act. The ITP was the first permit of its kind that allows the taking of condors.

4. In this action, Plaintiffs Wishtoyo Foundation, Delia Dominguez, and Center for Biological Diversity challenge the Service's approval of the TUMSHCP based on the Service's erroneous conclusion that California condors are not "Traditional Cultural Properties" under the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 479(f); 16 U.S.C. 470 § 101; 36 C.F.R. 800.4-800.6. This determination resulted in an inadequate consultation process with native persons under the NHPA. The Service's action was arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedures required by law within the meaning of

1  the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq.

2      5.    Plaintiffs seek declaratory relief that the Service has violated the NHPA and

3  APA.  Furthermore, Plaintiffs seek injunctive relief setting aside and vacating the

4  Service's approval of the TUMSHCP and ITP, and enjoining issuance of subsequent

5  permits and authorizations related to the TUMSHCP.

6  **JURISDICTION AND VENUE**

7      6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

8  (federal question), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§

9  701-706 (Administrative Procedure Act).

10      7.    This Court has authority to grant the requested relief pursuant to 28 U.S.C.

11  §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706

12  (Administrative Procedure Act).

13      8.    Venue lies in this Court pursuant to 28 U.S.C. § 1391(e).  Plaintiffs

14  Wishtoyo Foundation and Delia Dominguez reside within this district, the Service

15  maintains its Ventura office in this judicial district, and a substantial part of the events or

16  omissions giving rise to Plaintiffs' claims occurred within this district.

17  **PARTIES**

18      9.    Plaintiff WISHTOYO FOUNDATION, doing business as Wishtoyo

19  Chumash Foundation ("Wishtoyo" or "Wishtoyo Chumash Foundation"), is a nonprofit

20  organization incorporated under the laws of the State of California, and with its principal

21  place of business in unincorporated Ventura County, California.  Wishtoyo Chumash

22  Foundation has over 700 members composed primarily of Chumash people, Ventura

23  County residents, Santa Barbara County residents, and Los Angeles County residents.

24  Wishtoyo's mission is to preserve, protect, and restore Chumash heritage, the culture of

25  all indigenous communities, and the environment.  Wishtoyo shares traditional Chumash

26  beliefs, cultural practices, songs, dances, stories, and values with the public to instill

27  environmental awareness and responsibility for sustaining the health of our land, air, and

28  water for the benefit of future generations.  Wishtoyo Chumash Foundation brings this

---

action on behalf of itself and its adversely affected members and staff.

10.    The Chumash people and Wishtoyo have a strong cultural interest in the recovery of the California condor and the protection of the area now known as Tejon Ranch.  As evidenced by condor pictographs, condor ceremonies, and condor dances, the Chumash people have a long history of interacting with the California condor for many reasons, including religious and ceremonial purposes.  For over 10,000 years, the Chumash people have resided in villages, conducted ceremonies at sacred sites, and buried their dead in and around the area covered by the TUMSHCP.  The cultural and religious practices of the Chumash People, especially those involving the condor, are threatened by the Service's action.

11.    Plaintiff DELIA DOMINGUEZ, an individual, is a retired federal employee and the Chairperson of the Tinoqui-Chalola Council of Kitanemuk and Yowlumne Tejon Indians, a California Indian Tribe.  Ms. Dominguez was born and raised in Bakersfield, California, as was her mother Rebecca Martinez Reyes.  Ms. Dominguez's grandmother Petra Olivas Gamez Martinez was the last of many of her ancestors to be born on the Rancho El Tejon, and was part of the first generation to be forced off these lands.  Ms. Dominguez resides in Bakersfield and Covina, California, splitting her time equally between these residences.  Her home on the outskirts of southeast Bakersfield, which she has maintained since her birth, is part of a neighborhood where many Tejon Indians resided who would travel to Rancho El Tejon to visit their remaining family members.

12.    Ms. Dominguez is a designated Native American Heritage Commission Most Likely Descendant of the Kitanemuk and Yowlumne Tejon Indians of the Tejon Ranch area.  The Kitanemuk and Yowlumne Tejon Indians were early residents of the Tehachapi Mountains and the Antelope Valley, including the lands covered by the TUMSHCP, living in long-established settlements before being forcibly removed from Tejon Ranch.  The condor holds tremendous religious and cultural significance for the Kitanemuk and Yowlumne Tejon Indians and to Ms. Dominguez.  Ms. Dominguez's cultural and religious practices as a Kitanemuk and Yowlumne Tejon Indian, especially

those involving the condor, are threatened by the Service's action.  Ms. Dominguez also values the existence of condors in the wild, as well as intact condor habitat, for their own sake.

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a nonprofit, public interest environmental organization incorporated under the laws of the State of California.  The Center has about 69,000 members, including residents of parts of northern Los Angeles and southern Kern counties in the vicinity of the area covered by the TUMSHCP. The Center is dedicated to the protection of native species and their habitats through science, policy, and environmental law.   The Center has worked for many years to protect imperiled plants and wildlife, open space, air and water quality, and the overall quality of life for people in the Tehachapi Mountains region.  The Center brings this action on behalf of itself and its adversely affected members, staff, and directors.

14.     The Center's members and staff regularly use, and will continue to use, lands in and around the Tehachapi Mountains for observation, research, aesthetic enjoyment, and other recreational, scientific, and educational activities.  The Center's members and staff have and continue to research, study, observe, and seek protections for the California condor and other sensitive species found in the project area.  The Center's members, staff, and directors derive cultural, scientific, recreational, conservation, and aesthetic benefits from the condor's existence in the wild. Defendants' violations of law have threatened a further decline of California condor populations and degradation of habitat occupied by the species, harming the Center's and its members' interests in the condor and its habitat.

15.     Defendant the UNITED STATES FISH AND WILDLIFE SERVICE is the federal agency within the Department of Interior charged with responsibility for conserving endangered and threatened species under the Endangered Species Act ("ESA"), for enforcing and implementing the ESA, and for complying with the NHPA in connection with the Service's ESA actions.

**STATUTORY FRAMEWORK**

*ENDANGERED SPECIES ACT*

16.     The ESA "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).  To achieve species conservation, the ESA requires the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id*. § 1532(3).  The ESA's goal is thus to recover endangered species.

17.     To receive the protection that the ESA affords, the Service (which administers the ESA for non-marine species) must first list a species as "endangered" or "threatened."  16 U.S.C. § 1533.  A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).  A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

18.     The ESA also provides for the designation of critical habitat for endangered and threatened species—the areas occupied by a species at the time of listing that contain the physical or biological features essential to the conservation of the species, or unoccupied areas that the Service determines are essential for the conservation of the species. 16 U.S.C. § 1533(b)(2); 16 U.S.C. § 1532(5)(A).

19.     The ESA prohibits the unpermitted "taking" of endangered wildlife. "Take" is broadly defined as harming, harassing, trapping, capturing, wounding, or killing a listed species either directly or by habitat degradation.  16 U.S.C. § 1532(19). The prohibition also applies to the acts of third parties whose acts bring about the taking. 16 U.S.C. § 1538(g).

20.     Section 10 of the ESA provides one exception to the take prohibition for non-federal activities.  16 U.S.C. § 1539.  This provision allows the Service to issue an Incidental Take Permit ("ITP") that allows a person to legally proceed with an activity that would otherwise result in the illegal take of a listed species upon the Service's

approval of a Habitat Conservation Plan ("HCP") and finding that "such taking is incidental to and not the purpose of the carrying out of any otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

21.    An HCP must contain specific measures to "conserve," or provide for the recovery of, the species.  At a minimum, the ESA and implementing regulations require all HCPs to include the following: (1) a complete description of the activity sought to be authorized; (2) names of the species sought to be covered by the permit, including the number, age and sex of the species, if known; (3) the impact which will likely result from such taking; (4) what steps the applicant will take to monitor, minimize, and mitigate those impacts; (5) the funding that will be available to implement such monitoring, minimization, and mitigation activities; (6) the procedures to be used to deal with unforeseen circumstances; and (7) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized.  16 U.S.C. § 1539(a)(2)(A)(i)-(iv); 50 C.F.R. §§ 17.22, 17.32.  The Service cannot issue an ITP if the HCP does not contain this information.  16 U.S.C. § 1539(a)(2)(A).

22.    Upon reviewing an HCP and before permit issuance, the Service must find that (i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (v) any other measures the Service requires will be met.  16 U.S.C. § 1539(a)(2)(B); 50 C.F.R. §§ 17.22, 17.32.

23.    Pursuant to Section 7 of the ESA, for any action "authorized, funded, or carried out" by a federal agency, that agency shall consult with the Service to insure that such action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).  Where the Service is the action agency, it is required to consult with itself.

24.     As part of the ESA Section 7 consultation process, the Service makes a determination, through the preparation of a biological opinion as to whether or not the Service believes the proposed action is likely to jeopardize the continued existence of a listed species or is likely to adversely modify the species' critical habitat.  A biological opinion must include a summary of the information on which it is based, must adequately detail and assess how the action affects listed species and their critical habitats, and must be based "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2)-(b)(3); 50 C.F.R. §402.14(d).  This includes an evaluation of the "cumulative effects on the listed species."  50 C.F.R. § 402.14(g)(3).

**THE NATIONAL HISTORIC PRESERVATION ACT**

25.     Congress enacted the NHPA, 16 U.S.C. § 470 *et seq.*, in 1966 with the express intent that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people."  16 U.S.C. § 470(b)(2).

26.     Section 106 of the NHPA requires federal agencies involved in an "undertaking," which includes projects requiring a federal permit, to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in *or eligible for* inclusion in the National Register [of Historic Places] ."  16 U.S.C. § 470f (emphasis added).

27.     The NHPA is designed to ensure that federal decision-makers thoroughly evaluate and address the impacts of their proposed actions on historic properties prior to taking final action.

28.     The NHPA Section 106 process requires federal agencies involved in undertakings to make a reasonable and good faith effort to identify and disclose historic properties within affected areas, evaluate the potential adverse effects of the federal undertaking to the historic properties, and seek ways to avoid, minimize, or mitigate any adverse effects to the historic properties.  36 C.F.R. §§ 800.4-800.6.  Throughout all stages of the Section 106 process, the applicable federal agency must consult with Indian

1 tribes that attach religious and cultural significance to historic properties within the
2 affected area that may be affected by an undertaking, even if such an area is outside of a
3 Tribe's Reservation Boundaries.  Such areas are referred to as Traditional Cultural
4 Properties.  *Id.* §§ 800.2(c)(2)(ii)(iii), 800.3(f)(2), 800.4(a)(4), 800.5(c)(2)(iii), 800.6(a),
5 800.6(b)(2).

6     29.    The NHPA and its implementing regulations provide that "[c]onsultation
7 [with Indian tribes] should commence early in the planning process, in order to identify
8 and discuss relevant preservation issues … ." 36 C.F.R. § 800.2(c)(2)(ii)(A).  Federal
9 agencies "shall make a reasonable and good faith effort to identify any Indian tribes …
10 that might attach religious and cultural significance to historic properties in the area of
11 potential effects and invite them to be consulting parties."  36 C.F.R. § 800.3(f)(2).
12 Consultation with a tribe "must recognize the government-to-government relationship
13 between the federal government and Indian tribes." *Id.*, § 800.2(c)(2)(ii)(C).  In the
14 consultation process, federal agencies must provide the tribe with "a reasonable
15 opportunity to identify its concerns about historic properties, advise on the identification
16 and evaluation of historic properties, including those of traditional religious and cultural
17 importance, articulate its views on the undertaking's effects on such properties, and
18 participate in the resolution of adverse effects."  *Id.*, § 800.5(c)(2)(ii)(A).

19 ***ADMINISTRATIVE PROCEDURE ACT***

20     30.    The Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706,
21 provides for judicial review of final agency action.

22     31.    Under the authority of the APA, a reviewing court must hold unlawful and
23 set aside agency action, findings, and conclusions found to be arbitrary, capricious, an
24 abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).  A
25 reviewing court must also set aside agency action, findings, and conclusions found to be
26 without observance of procedure required by law.  5 U.S.C. § 706(2)(D).

27
28 / / /

Complaint for Declaratory and Injunctive Relief                                        10

**FACTUAL AND PROCEDURAL ALLEGATIONS**

*THE CALIFORNIA CONDOR*

32.     The California condor (*Gymnogyps californianus*) is the largest bird in North America, weighing as much as twenty-five pounds, standing as tall as four and a half feet, and soaring on wings more than nine feet wide.  These majestic birds once dominated Western skies from Canada to Mexico, from the Pacific coast as far inland as Utah, but their range has been greatly reduced to parts of Central and Southern California, with experimental, reintroduced population in northern Arizona/southern Utah and Baja California.

33.     Condors are obligate scavengers, meaning they feed only on carrion—carcasses of animals—and do not hunt.  Condors prefer the carcasses of large mammals such as deer and whales, but are also known to eat the carcasses of smaller animals such as California ground squirrels.

34.     California condors live in rocky, forested regions including canyons, gorges and mountains.  Condors soar on wind currents to heights of up to 15,000 feet and travel up to 150 miles a day in search of food, searching for carcasses by sight, not smell.

35.     Habitat loss and destruction, hunting, lead poisoning, decrease in food source, the capturing of live birds and eggs, collisions with power lines and wind turbines, and other human-caused assaults have decimated the species.  When wild California condors populations were first measured in 1968, only 50-60 birds remained.

36.     The California condor was listed as endangered under the 1966 Endangered Species Preservation Act—the precursor to the ESA—in 1966.  80 Stat. 926, 926-930, P.L. 89-669, Oct 15, 1966.  The next year, the Secretary of the Interior approved the first list of endangered species and the California condor was among the first 78 species listed as endangered.  32 Fed. Reg. 4001.

37.     In 1973, the ESA replaced the Endangered Species Preservation Act.  Species listed under the prior act, including the California condor, were grandfathered in as listed species under the ESA.  Despite the listing of the condor as endangered, by

1982 there were only 22 California condors left in the wild.

38.     In 1982, fearing the condor's imminent extinction, the Service began capturing all wild condors.  Upon the removal of the last condor, the species became extinct in the wild.  A captive breeding program began shortly thereafter with the first birds being released back into the wild in 1992.

39.     With the captive breeding and reintroduction program, condor numbers have slowly increased.  As of December 2017, there were 290 California condors in the wild, including 90 in Central California, 80 in Southern California, 82 in northern Arizona and southern Utah, and 38 in Baja California.  An additional 173 condors were in captivity.

40.     The condor's gradual recovery has required significant and ongoing human intervention and management, including the repeated recapture of condors for treatment for lead poisoning and the continued release of captive-born birds.

41.     California condors are fully-protected birds under California law (Cal. Fish & Game Code § 3511(b)(5)), and may not be taken at any time except for certain narrow exceptions such as for "necessary scientific research, including efforts to recover fully protected, threatened, or endangered species" (*id*. at §3511(a)(1)), or if take is authorized under an approved Natural Communities Conservation Plan ("NCCP") (*id*.; *see* Fish & Game Code § 2835.)  There is no approved NCCP that would cover take of condor for any of the Tejon Ranch activities.

42.     California condors continue to die of lead poisoning from feeding on the carcasses of animals contaminated with the lead fragments of hunters' bullets and shot, although state legislation banning the use of lead bullets in the California counties home to critical habitat has reduced condor mortality.   Between 1992 to 2012, 123 condors died of lead poisoning.  In 2013, at least 10 condors died of lead poisoning and 57 were treated for lead toxicosis.  In 2016, one condor died was confirmed dead from lead poisoning, and 15 were treated.

43.     In 1976, the Service designated 570,400 acres as critical habitat for the

---

condor.  41 Fed. Reg. 41914 (September 24, 1976.)  The designation created nine geographically distinct critical habitat units spread throughout the condor's "U" shaped range at the base of California's Central Valley.  One of these units—the Tejon Ranch Critical Habitat Unit ("Tejon Ranch Unit")—covers 134,871 acres of Tejon Ranch's 270,365 "land, water, and airspace" acres.  41 Fed. Reg. 41914 (amended with no changes in 42 Fed. Reg. 47840-45).  The critical habitat designation identified the Tejon Ranch Unit as "critical for feeding and related activities" and further explained that the unit "is very important because it contains the only significant feeding habitat remaining in close proximity to the Sespe-Piru Condor nesting area."  41 Fed. Reg. 41914.

44.  The California condor holds great religious and cultural significance to tribes with ancestral lands within and adjacent to Tejon Ranch, in particular the Chumash and the Kitanemuk and Yowlumne Tejon Indians.  Like the status of the bald eagle in other indigenous cultures, the practice of the Chumash and the Kitanemuk and Yowlumne Tejon Indians religions, cultural traditions, connection to their ancestors, and cultural ceremonies requires access to and seeing the California condors in specific locations and sacred sites, including at ancestral burial sites.  Both the Chumash and the Kitanemuk and Yowlumne Tejon Indians, in continuation of the traditional cultural and religious practices of their ancestors, honor the condor through ceremonial dance, other ceremonial and cultural practices, and through oral history.  Due to the precipitous decline of the species, practitioners have had difficulty collecting condor feathers for use in condor dances, and other sacred religious ceremonies and cultural practices, including those connecting them to their ancestors.  The  condor and condor habitat play a vital role in these communities' historically-rooted beliefs, customs, and practices and, as such, are Traditional Cultural Properties.

45.  The presence of the condor and condor habitat on, around, and over the lands covered by the TUMSHCP, which include Chumash and Kitanemuk and Yowlumne Tejon Indians' current and traditional territories, burial sites, and sacred cultural and religious landscapes and viewscapes, allows and is necessary for these tribes

to connect with their ancestors, is necessary for these tribal members to continue honoring and connecting with the condor in ceremonies and traditions, and is necessary for these tribes' cultural and ceremonial use of sacred sites which are dependent on the condor's presence on the sites or flying overhead.

**TEJON RANCH**

46.     The area now known as Tejon Ranch is located in Kern and Los Angeles counties, in and around the Tehachapi Mountains of California.  Tejon Ranch contains a great diversity of landforms, topography, habitats, wildlife, and plant communities.  In addition to the California condor, Tejon Ranch provides habitat for the endangered southwestern willow flycatcher (*Empidonax traillii extimus*), the endangered least Bell's vireo (*Vireo bellii pusillus*), the threatened western yellow-billed cuckoo (*Coccyzus americanus occidentalis*), and several other species that are not protected under the ESA but are "covered" species under the TUMSHCP.

47.     Prior to the arrival of non-native peoples, the region is known to have been occupied by numerous Native American tribes such as the Kitanemuk, Yowlumne Yokuts, Tulamni Yokuts, Hometwoli Yokuts, Interior Chumash, Tataviam, and Kawaiisu tribes, and was a travel and trade route for a multitude of coastal Chumash tribes, bands, and clans that occupied areas in the region when coming through.

48.     The Chumash people resided in villages, conducted ceremonies and cultural practices at sacred sites, and buried their dead in and around the present Tejon Ranch area for over 10,000 years.  The Kitanemuk and Yowlumne Tejon Indians were likewise early residents of the Tehachapi Mountains and the Antelope Valley, including the lands covered by the TUMSHCP.

49.     During the California gold rush, United States officials tasked Lieutenant Edward Fitzgerald Beale with removing native people from their land to facilitate the arrival of settlers into the area.  In 1851, a temporary camp was set up at Tejon Pass for the execution of a treaty with native peoples in the region, known as Treaty D.  Lt. Beale brought in tribal representatives from the region, including the Tejon Ranch, Lake

Isabella, Castec, Rancho San Emigdio, Buena Vista Lake, Kern Lake, Kern River, and Grapevine areas, to agree under the treaty to vacate the majority of the mountainous inland tribal homelands in exchange for the promise of goods, annuities, and reservation land in the Central Valley.  In 1852, Lt. Beale established a reservation for all those native people represented as signatory parties to Treaty D, including those originally from the Tejon Ranch lands, further facilitating the removal of the historic occupants of the Tejon Ranch.  The reservation was named the Sebastian Indian Reservation after William King Sebastian, then chairman of the Senate Committee on Indian Affairs.  Treaty D, also known as the Tejon Treaty, was never ratified, yet the land was not returned, the reservation was soon returned to private, non-tribal ownership, and the reservation occupants were again forced to leave.

50.     In 1858, the Lands Commission ratified claims to Tejon Ranch land based upon earlier Mexican land grants.  The tribes were stripped of their rights to the Sebastian Reservation and again displaced.  Beale bought numerous parcels from those declared to be owners by the Lands Commission until he owned the whole of what is now know as Tejon Ranch.  He began ranching the land in the late 1800s and continued to expel the native inhabitants who had been deprived of their rightful ancestral land through his political maneuvering.

51.     In 1912, a group of businessmen purchased Tejon Ranch.  In 1936, ranch ownership was transferred to the Tejon Ranch Co.  The Tejon Ranch Co. is now operated as Delaware corporation, publically traded on the New York Stock Exchange.  The Tejon Ranchcorp, a wholly owned subsidiary of the Tejon Ranch Co. and a California corporation, holds title to the Tejon Ranch lands with the exception of the lands comprising the Tejon Industrial Complex.

52.     In February 2003, the adult condor known as AC-8 was shot and killed on Tejon Ranch lands during a hunt authorized by Tejon Ranch Co.  AC-8 was first observed in the 1960s nesting within Tejon Ranch, was one of the last remaining condors born in the wild prior to 1982, and was the first of the wild-born condors to be

re-released to the wild in 2000.  The Service considered AC-8 to be a mentor bird for captive-raised condors that had been released.  Plaintiff Delia Dominguez attended the federal court hearing for the hunter who shot AC-8, and sought the release of AC-8's remains to the Kitanemuk and Yowlumne Tejon Indians for the use of AC-8's feathers in traditional religious and cultural ceremonies and regalia, for sharing with other tribes for use in traditional religious and cultural ceremonies and regalia, and to provide the condor with a ceremonial burial.  While AC-8's remains were ultimately turned over to a federally-recognized tribe, the Kitanemuk and Yowlumne Tejon Indians were qualified to receive the remains based on the Tribe's special connection to the condor rooted in religious and cultural practices.

53.     Tejon Ranch remains vital to the Southern California condor population due to several unique characteristics, demonstrated by the fact that most of the condors in Southern California have been documented foraging (searching for food and feeding) at the Tejon Ranch Unit.  Livestock grazing operations, native ungulates, and the hunting of non-native game species provides an abundant food supply.  The condors are able to ride the area's strong and reliable winds to travel the long distances required to visually locate carcasses and, the area's abundance of other scavengers, including vultures and eagles, helps the condors forage.  The area's long history of isolation has kept it largely free from detrimental human influences associated with urbanization making suitable overnight roosting locations and foraging grounds especially attractive to condors.  Accordingly, the Tejon Ranch Unit demonstrates very high levels of condor activity.

54.     The Tejon Ranch Unit has become even more critical to the survival and recovery of the California condor as urban development, oil and gas extraction, farming, and wind energy development elsewhere have transformed formerly suitable foraging habitat into areas that may not be compatible with California condor recovery.

### THE TUMSHCP AND TEJON MOUNTAIN VILLAGE

55.     In 1997, the Tejon Ranch Co. filed a lawsuit against the Service seeking to halt the release of California condors near Tejon Ranch and to have any released condors

in California be classified as an experimental population under ESA Section 10(j).  In or around 2002, the Service and Tejon Ranch Co. began negotiating the agreement that culminated in the TUMSHCP.  Under the terms of this deal, which remained under seal until 2009, Tejon Ranch Co. dismissed this lawsuit in 2014 based on the Service's 2013 approval of the TUMSHCP and issuance of the ITP in a form acceptable to the Tejon Ranch Co.

56.     In 2005, Tejon Ranch Co., with the Service's technical assistance, began drafting the TUMSHCP in an effort to obtain an ITP for a variety of protected species for the "covered lands"—141,886 of Tejon Ranch's 270,365 acres.  The covered lands include Tejon Ranch Co.'s Tejon Mountain Village luxury resort residential and commercial development project, which would result in 5,533 acres of permanent ground disturbance and up to an additional 1,773 acres of vegetation clearing within a total development envelope of 8,817 acres.

57.     Tejon Mountain Village anticipated buildout would include up to 3,450 residences, 160,000 square feet of commercial development, 750 hotel rooms, and 350,000 square feet of support uses as well as two golf courses and an equestrian center. Kern County approved a specific plan for Tejon Mountain Village in 2009, but development has not commenced.

58.     The Service released the draft TUMSHCP, draft environmental impact statement, and the proposed implementation agreement for the plan in February 2009. 74 Fed. Reg. 6050.  In January 2012, the Service released a supplemental environmental impact statement for the plan.  Plaintiffs submitted written comments on the TUMSHCP, environmental impact statement, and supplemental environmental impact statement.

59.     In 2012, the Service contacted a dozen tribes and tribal representatives, including Plaintiff Delia Dominguez, who the Service believed had an interest in the TUMSHCP and the project area, "to ensure that the relevant Native American community had been given the opportunity to consult on the most current description of the undertaking," and to identify Traditional Cultural Properties that may occur in the

project area.  Although commenters, including Plaintiffs, identified the condor and condor habitat as Traditional Cultural Properties that should be included in the scope of the Service's NHPA consultation, the Service refused to recognize condors or condor habitat as Traditional Cultural Properties and therefore did not consult with tribes or tribal representatives on the TUMSHCP's effects on condors, condor habitat, or the resulting effects on Traditional Tribal Cultural Properties, tribal cultural practices, tribal ceremonial practices, and tribal religious practices..

60.     On April 26, 2013, the Service issued its final Biological Opinion for the TUMSHCP.  The Biological Opinion concluded that, although condors currently use and are likely to continue to use the Tejon Ranch Unit, the proposed activities on covered lands within Tejon Ranch were not likely to jeopardize the existence or recovery of the California condor.  The Service also concluded that the Tejon Mountain Village development was not likely to destroy or adversely modify the condor's critical habitat, despite the project's permanent elimination or modification of thousands of acres of designated critical habitat.  Development pursuant to the TUMSHCP will result in the direct and indirect modification of approximately 12,000 acres of condor foraging habitat within the Tejon Ranch Unit.

61.     On April 29, 2013, the Service released its final Record of Decision for the TUMSHCP environmental impact statement and issued Tejon Ranch Co. a 50-year, renewable ITP for "approximately 145,000 acres of Tejon Ranchcorp lands in Kern County, California."  The ITP authorized incidental take of four California condors as well as 12 other species associated with the proposed activities.

## CLAIM FOR RELIEF

### Violation of the NHPA

62.     Plaintiffs hereby re-allege and incorporate by reference each and every allegation set forth in this Complaint as if set forth in full herein.

63.     The Service violated the NHPA when it approved the TUMSHCP, issued the ITP, and issued the Record of Decision without taking into account, evaluating, or

---

attempting to mitigate the effects of these approvals on the California condor; condor nests; tribal cultural and tribal sacred landscapes, sites, burial grounds, and viewscapes, of which the cultural and religious function and significance to tribes are dependent on the presence of the condor; and/or condor habitat as Traditional Cultural Properties. 16 U.S.C. § 479(f); 16 U.S.C. 470 § 101; 36 C.F.R. 800.4-800.6.

64.     The Service's conclusion that the California condor; condor nests; tribal cultural and tribal sacred landscapes, sites, burial grounds, and viewscapes, of which the cultural and religious function and significance to tribes are dependent on the presence of the condor; and condor habitat are not Traditional Cultural Properties was arbitrary, capricious, and not in accordance with law as required by NHPA.

65.     The Service's failure to consult with tribes and tribal representatives regarding the effect of the TUMSHCP on the California condor; condor nests; tribal cultural and tribal sacred landscapes, sites, burial grounds, and viewscapes, of which the cultural and religious function and significance to tribes are dependent on the presence of the condor; and/or condor habitat was arbitrary, capricious, and not in accordance with law as required by NHPA, and represents agency action unlawfully withheld in violation of the APA.

66.     The Service failed to adequately identify and analyze other historic and cultural resources within the TUMSHCP area that are at risk due to the Tejon Mountain Village project despite the fact that the Service was aware of the details of at least 58 separate areas containing such resources.  Plaintiffs informed the Service of the State of California's comprehensive, three phase archaeological survey prepared as part of the California Environmental Quality Act review process for Tejon Mountain Village.  That survey identified 58 distinct places of historic and cultural value, the majority which were places significant to the local Native American tribes, including the Chumash and Kitanemuk and Yowlumne Tejon Indians.  Among these known areas were sacred sites and burial grounds.  The Service knowingly and intentionally violated the NHPA when it failed to adequately identify and analyze the historic and cultural resources that it was

aware of within the TUMSHCP area.

67.    For each of the above reasons, and others, the Service's approval of the TUMSHCP, ITP, and Record of Decision is arbitrary, capricious, and not in accordance with law as required by NHPA, its implementing regulations, and the APA, and is subject to judicial review thereunder.  5 U.S.C. §§ 701-706.

**PRAYER FOR RELIEF**

Plaintiffs request that this Court enter judgment providing the following relief:

1.    A judgment declaring that the Service violated the NHPA due to its failure to conduct the NHPA's required consultation on Traditional Cultural Properties and failure to seek ways to avoid, minimize, or mitigate adverse effects to such properties, and that such failure is arbitrary, capricious, and not in accordance with procedures required by law pursuant to the APA, 5 U.S.C. §§ 701-706;

2.    A judgment declaring that the Service's approvals of the Tehachapi Uplands Multiple Species Habitat Conservation Plan, Biological Opinion, Incidental Take Permit, and Record of Decision are unlawful based on the Service's violation of the NHPA;

3.    A judgment that the Service failed to comply with the requirements of the NHPA, and that such failure constitutes agency action unlawfully withheld as provided by Section 706(1) of the APA;

4.    A judgment that the Service failed to comply with the requirements of the APA insofar as its failure to comply with the NHPA is arbitrary, capricious, not in accordance with procedures required by law, and constitutes agency action that is unlawfully withheld as provided by the APA, 5 U.S.C. §§ 701-706;

5.    An order vacating and setting aside the Tehachapi Uplands Multiple Species Habitat Conservation Plan, Biological Opinion, Incidental

Take Permit, and Record of Decision pending the Service's compliance with the NHPA;

6.    An order enjoining the Service from issuing further permits and authorizations pursuant to the TUMSHCP pending the Service's compliance with the NHPA;

7.    An award to Plaintiffs of their costs of litigation, including reasonable attorneys' fees as provided in the Equal Access to Justice Act and/or any other applicable law; and

8.    Any other such relief as the Court deems just and proper.

Respectfully submitted this 25th day of April, 2019.

/s/ John Buse
John Buse
Lisa T. Belenky
John Rose
CENTER FOR BIOLOGICAL
DIVERSITY

Jason Weiner
WISHTOYO FOUNDATION

Attorney for Plaintiffs