John Buse (CA Bar No. 163156)
Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Telephone: (510) 844-7100
Fax: (510) 844-7150
jbuse@biologicaldiversity.org
lbelenky@biologicaldiversity.org

Attorneys for Plaintiffs

(*additional counsel on next page*)

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **WISHTOYO FOUNDATION, DELIA DOMINGUEZ, and CENTER FOR BIOLOGICAL DIVERSITY** ) <br><br> Plaintiffs, ) <br><br> **v.** ) <br><br> **UNITED STATES FISH AND WILDLIFE SERVICE,** ) <br><br> Defendant, ) <br>_____ ) <br> **TEJON RANCHCORP and TEJON MOUNTAIN VILLAGE, LLC**, ) <br><br> Proposed Defendant-Intervenors. ) <br>_____ ) | Case No. 2:19-cv-3322 <br><br><br><br><br> **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

*Additional counsel:*

Jason Weiner (CA Bar No. 259264)
WISHTOYO FOUNDATION
9452 Telephone Road #432
Ventura, CA 93004
Telephone: (805) 823-3301
Email: jweiner.venturacoastkeeper@wishtoyo.org

John Rose (CA Bar No. 285819)
CENTER FOR BIOLOGICAL DIVERSITY
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
Telephone: (213) 785-5400
Fax: (213) 785-5748
jrose@biologicaldiversity.org

**INTRODUCTION**

1. The California condor is one of the most imperiled animals on the planet. After four decades of protection as an endangered species, an unprecedented captive breeding program, implementation of California legislation banning lead bullets, and continued feeding and management efforts, California condors are mounting a gradual recovery, but remain critically endangered in 2019.

2. The condor's decline has had a marked impact on native peoples in central California, in particular the Kitanemuk and Yowlumne Tejon and Chumash—tribes with ancestral lands in the condor's historical range. The condor is of tremendous religious and cultural significance to these tribes and the decline of the species has contributed to their inability to perform essential religious ceremonies and cultural practices.

3. The condor now faces a threat from the very agency tasked with protecting it—the U.S. Fish and Wildlife Service (the "Service"). In 2013, the Service approved the Tehachapi Uplands Multiple Species Habitat Conservation Plan ("TUMSHCP"), which authorizes large-scale development that will permanently destroy or adversely modify thousands of acres that the Service has designated as critical habitat for the condor at Tejon Ranch in Kern County, California. In connection with its approval of the TUMSHCP, the Service issued an Incidental Take Permit ("ITP") allowing the "taking" of California condors under the Endangered Species Act. The ITP was the first permit of its kind that allows the taking of condors.

4. In this action, Plaintiffs Wishtoyo Foundation, Delia Dominguez, and Center for Biological Diversity challenge the Service's approval of the TUMSHCP due to the Service's failure to adequately take into account the effect of the TUMSHCP on California condors and condor habitat under the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 306108; 36 C.F.R. 800.4-800.6. The Service's failure also resulted in an inadequate and incomplete consultation process with native persons under the NHPA, and foreclosed any steps the Service might have taken to avoid or minimize injury to Plaintiffs' cultural interests in condors and specific areas of Tejon Ranch

inhabited or used by condors.  The Service's action was arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedures required by law within the meaning of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq.

5.     Plaintiffs seek declaratory relief that the Service has violated the NHPA and APA.  Furthermore, Plaintiffs seek injunctive relief setting aside and vacating the Service's approval of the TUMSHCP and ITP, and enjoining issuance of subsequent permits and authorizations related to the TUMSHCP.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

7.     This Court has authority to grant the requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

8.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e).  Plaintiffs Wishtoyo Foundation and Delia Dominguez reside within this district, the Service maintains its Ventura office in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

## PARTIES

9.     Plaintiff WISHTOYO FOUNDATION, doing business as Wishtoyo Chumash Foundation ("Wishtoyo" or "Wishtoyo Chumash Foundation"), is a nonprofit organization incorporated under the laws of the State of California, and with its principal place of business in unincorporated Ventura County, California.  Wishtoyo Chumash Foundation has over 700 members composed primarily of Chumash people, Ventura County residents, Santa Barbara County residents, and Los Angeles County residents. Wishtoyo's mission is to preserve, protect, and restore Chumash heritage, the culture of all indigenous communities, and the environment.  Wishtoyo shares traditional Chumash

beliefs, cultural practices, songs, dances, stories, and values with the public to instill environmental awareness and responsibility for sustaining the health of our land, air, and water for the benefit of future generations.  Wishtoyo Chumash Foundation brings this action on behalf of itself and its adversely affected members and staff.

10.    The Chumash people and Wishtoyo have a strong cultural interest in the recovery of the California condor and the protection of the area now known as Tejon Ranch.  As evidenced by condor pictographs, condor ceremonies, and condor dances, the Chumash people have a long history of interacting with the California condor for many reasons, including religious and ceremonial purposes.  For over 10,000 years, the Chumash people have resided in villages, conducted ceremonies at sacred sites, and buried their dead in and around the area covered by the TUMSHCP.  The cultural and religious practices of the Chumash People and Wishtoyo's members, especially those involving the condor, are threatened by the Service's failure to adequately take account of the condor and condor habitat under the NHPA prior to its approval of the TUMSHCP.  In particular, the project enabled by the TUMSHCP—Tejon Mountain Village—proposes to develop and permanently destroy or alter specific areas and landscape features critical to the condor's presence at sites and in areas that hold great cultural and religious significance for the Chumash peoples where Chumash peoples conduct and maintain their cultural and religious practices and ceremonies that require the localized presence of the condor.  Wishtoyo has a cultural and religious interest in avoiding or minimizing these localized effects.

11.    Plaintiff DELIA DOMINGUEZ is named as an individual and as the Chairperson of the Tinoqui-Chalola Council of Kitanemuk and Yowlumne Tejon Indians, a non-federally recognized California Indian Tribe.  Ms. Dominguez was born and raised in Bakersfield, California, as was her mother Rebecca Martinez Reyes.  Ms. Dominguez's grandmother Petra Olivas Gamez Martinez was the last of many of her ancestors to be born on the Rancho El Tejon, and was part of the first generation to be forced off these lands.  Ms. Dominguez is a retired federal employee who resides in

Bakersfield and Covina, California, splitting her time equally between these residences. Her home on the outskirts of southeast Bakersfield, which she has maintained since her birth, is part of a neighborhood where many Tejon Indians resided who would travel to Rancho El Tejon to visit their remaining family members.

12.     Ms. Dominguez is a designated Native American Heritage Commission Most Likely Descendant of the Kitanemuk and Yowlumne Tejon Indians of the Tejon Ranch area, and was a consulting party in the Service's NHPA consultation on the TUMSHCP.  The Kitanemuk and Yowlumne Tejon Indians were early residents of the Tehachapi Mountains and the Antelope Valley, including the lands covered by the TUMSHCP, living in long-established settlements before being forcibly removed from Tejon Ranch.  Ms. Dominguez provided comments on the TUMSHCP, and has visited the TUMSHCP area, including the Tejon Mountain Village site, many times.  Around 2006, she was contacted by the Native American Heritage Commission as a Most Likely Descendant after human remains were found on Tejon Ranch.  She visited the ranch with family members, returning on several occasions to participate in the restoration of the schoolhouse her ancestors had attended, until her access to the ranch became increasingly restricted by Tejon.  On at least one occasion, Ms. Dominguez has visited a mountaintop area of Tejon Ranch on or near the high-elevation portions of the Tejon Mountain Village site that provides sweeping views of the Grapevine and Castac Lake areas.  Just below this mountaintop, she observed a rock formation with a small cave and outside area with miniature mortar holes used by native people for grinding.  She considers this area to be a sacred site used for healing purposes, ceremony, and prayer.

13.     The condor holds tremendous religious and cultural significance for the Kitanemuk and Yowlumne Tejon Indians and to Ms. Dominguez.  Ms. Dominguez's cultural and religious practices as a Kitanemuk and Yowlumne Tejon Indian, especially those involving the condor, are threatened by the Service's failure to adequately take account of the condor and condor habitat under the NHPA prior to its approval of the TUMSHCP because the Tejon Mountain Village project enabled by the TUMSHCP

proposes to develop and permanently destroy or alter specific areas and landscape features critical to the condor's presence at sites and in areas that hold great cultural and religious significance for Ms. Dominguez and the Kitanemuk and Yowlumne Tejon Indians where Ms. Dominguez and the Kitanemuk and Yowlumne Tejon Indians have conducted and maintained, and intend in the future to conduct and maintain, their cultural and religious practices and ceremonies that require the localized presence of the condor.  Ms. Dominguez also values the existence of condors in the wild, as well as intact condor habitat, for their own sake.

14.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a nonprofit, public interest environmental organization incorporated under the laws of the State of California.  The Center has about 70,000 members, including residents of parts of northern Los Angeles and southern Kern counties in the vicinity of the area covered by the TUMSHCP. The Center is dedicated to the protection of native species and their habitats through science, policy, and environmental law.   The Center has worked for many years to protect imperiled plants and wildlife, open space, air and water quality, and the overall quality of life for people in the Tehachapi Mountains region.  The Center brings this action on behalf of itself and its adversely affected members, staff, and directors.

15.     The Center's members and staff regularly use, and will continue to use, lands in and around the Tehachapi Mountains for observation, research, aesthetic enjoyment, and other recreational, scientific, and educational activities.  The Center's members and staff have and continue to research, study, observe, and seek protections for the California condor and other sensitive species found in the project area.  The Center's members, staff, and directors derive cultural, scientific, recreational, conservation, and aesthetic benefits from the condor's existence in the wild.  The Service's failure to adequately take account of the condor and condor habitat under the NHPA prior to its approval of the TUMSHCP has harmed the Center's and its members' interests in the condor and its habitat.  The Tejon Mountain Village project enabled by

the TUMSHCP proposes to develop and permanently destroy or alter specific areas and landscape features that are critical for condors and that hold the greatest cultural, scientific, recreational, conservation, and aesthetic significance for the Center and its members.

16.    The cultural, religious, scientific, recreational, conservation, and aesthetic interests of each Plaintiff, and all Plaintiffs, are harmed by the Service's failure to take into account the effects of the activities authorized, permitted, or enabled by its approval of the TUMSHCP on condors and their habitat for purposes of avoiding or mitigating the adverse effects of these activities on condors and their habitat as required by the NHPA. The Service's failure to adequately take into account the Native American cultural and religious impacts of its actions on condors and condor habitat has precluded the Service from taking any action required by the NHPA to avoid or mitigate these adverse effects in connection with the Service's approval of the TUMSHCP, and will result in avoidable adverse effects on condors and condor habitat *qua* Traditional Cultural Properties. These adverse effects on condors and condor habitat will occur as a result of the Service's failure to comply with the requirements of the NHPA, and will injure and impair Plaintiffs' ability to pursue their cultural, religious, scientific, recreational, conservation, and aesthetic interests in condors and condor habitat.  These adverse effects on condors and condor habitat can be avoided or minimized, and Plaintiffs' injuries can be redressed, only if the Service complies with the requirements of the NHPA.  Accordingly, Plaintiffs and their members have been, are being, and unless the requested relief is granted, will continue to be injured by the Service's failure to comply with the NHPA.

17.    Plaintiffs and their members have also suffered procedural injury to their cultural, religious, scientific, recreational, conservation, and aesthetic interests in condors and condor habitat as a result of the Service's failure to comply with the NHPA. Plaintiffs and their members rely on the Service to make an informed decision regarding the TUMSHCP based on, among other things, consideration of information obtained

through the NHPA consultation process.  The Service's failure to comply with the NHPA precluded informed decision-making regarding the TUMSHCP's effects on condors and condor habitat *qua* Traditional Cultural Properties.  As a result, Plaintiffs, their members, and the public at large are denied essential information regarding the management and preservation of condors and condor habitat *qua* Traditional Cultural Properties.  These procedural and informational injuries can only be remedied if the Service is made to comply with the NHPA.

18.   Defendant the UNITED STATES FISH AND WILDLIFE SERVICE is the federal agency within the Department of Interior charged with responsibility for conserving endangered and threatened species under the Endangered Species Act ("ESA"), for enforcing and implementing the ESA, and for complying with the NHPA in connection with the Service's ESA actions. The Service approved the TUMSHCP and issued the TUMSHCP ITP.

19.   Defendant-Intervenor TEJON RANCHCORP is a wholly-owned subsidiary of Tejon Ranch Company, and is the permittee under the TUMSHCP ITP.

20.   Defendant-Intervenor TEJON MOUNTAIN VILLAGE, LLC is a wholly-owned subsidiary of Tejon Ranch Company, and is the applicant for the Tejon Mountain Village project.

**STATUTORY FRAMEWORK**

***ENDANGERED SPECIES ACT***

21.   The ESA "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).  To achieve species conservation, the ESA requires the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id*. § 1532(3).  The ESA's goal is thus to recover endangered species.

22.   To receive the protection that the ESA affords, the Service (which administers the ESA for non-marine species) must first list a species as "endangered" or

"threatened."  16 U.S.C. § 1533.  A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).  A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

23.     The ESA also provides for the designation of critical habitat for endangered and threatened species—the areas occupied by a species at the time of listing that contain the physical or biological features essential to the conservation of the species, or unoccupied areas that the Service determines are essential for the conservation of the species. 16 U.S.C. § 1533(b)(2); 16 U.S.C. § 1532(5)(A).

24.     The ESA prohibits the unpermitted "taking" of endangered wildlife. "Take" is broadly defined as harming, harassing, trapping, capturing, wounding, or killing a listed species either directly or by habitat degradation.  16 U.S.C. § 1532(19). The prohibition also applies to the acts of third parties whose acts bring about the taking. 16 U.S.C. § 1538(g).

25.     Section 10 of the ESA provides one exception to the take prohibition for non-federal activities.  16 U.S.C. § 1539.  This provision allows the Service to issue an Incidental Take Permit ("ITP") that allows a person to legally proceed with an activity that would otherwise result in the illegal take of a listed species upon the Service's approval of a Habitat Conservation Plan ("HCP") and finding that "such taking is incidental to and not the purpose of the carrying out of any otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

26.     An HCP must contain specific measures to "conserve," or provide for the recovery of, the species.  At a minimum, the ESA and implementing regulations require all HCPs to include the following: (1) a complete description of the activity sought to be authorized; (2) names of the species sought to be covered by the permit, including the number, age and sex of the species, if known; (3) the impact which will likely result from such taking; (4) what steps the applicant will take to monitor, minimize, and mitigate those impacts; (5) the funding that will be available to implement such

monitoring, minimization, and mitigation activities; (6) the procedures to be used to deal with unforeseen circumstances; and (7) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized.  16 U.S.C. § 1539(a)(2)(A)(i)-(iv); 50 C.F.R. §§ 17.22, 17.32.  The Service cannot issue an ITP if the HCP does not contain this information.  16 U.S.C. § 1539(a)(2)(A).

27.    Upon reviewing an HCP and before permit issuance, the Service must find that (i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (v) any other measures the Service requires will be met.  16 U.S.C. § 1539(a)(2)(B); 50 C.F.R. §§ 17.22, 17.32.

28.    Pursuant to Section 7 of the ESA, for any action "authorized, funded, or carried out" by a federal agency, that agency shall consult with the Service to insure that such action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).  Where the Service is the action agency, it is required to consult with itself.

29.    As part of the ESA Section 7 consultation process, the Service makes a determination, through the preparation of a biological opinion as to whether or not the Service believes the proposed action is likely to jeopardize the continued existence of a listed species or is likely to adversely modify the species' critical habitat.  A biological opinion must include a summary of the information on which it is based, must adequately detail and assess how the action affects listed species and their critical habitats, and must be based "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2)-(b)(3); 50 C.F.R. §402.14(d).  This includes an evaluation of the "cumulative effects on the listed species."  50 C.F.R. § 402.14(g)(3).

1   ***THE NATIONAL HISTORIC PRESERVATION ACT***

2       30.   Congress enacted the NHPA, former 16 U.S.C. § 470 *et seq.*, in 1966 with
3   the express intent that "the historical and cultural foundations of the Nation should be
4   preserved as a living part of our community life and development in order to give a
5   sense of orientation to the American people."  Former 16 U.S.C. § 470(b)(2).

6       31.   The NHPA requires federal agencies involved in an "undertaking," which
7   includes projects requiring a federal permit, to "take into account the effect of the
8   undertaking on any historic property."  54 U.S.C. § 306108.  An "historic property" is
9   "any prehistoric or historic district, site, building, structure, or object that is included on,
10  *or eligible for* inclusion on the National Register [of Historic Places], including artifacts,
11  records, and material remains relating to the district, site, building, structure, or object."
12  54 U.S.C. § 300308 (emphasis added).  An historic property eligible for inclusion in the
13  National Register "because of its association with cultural practices or beliefs of a living
14  community that (a) are rooted in that community's history, and (b) are important in
15  maintaining the continuing cultural identity of the community" is a "Traditional Cultural
16  Property."  National Register Bulletin 38, *Guidelines for Evaluating and Documenting*
17  *Traditional Cultural Properties*.

18      32.   The NHPA is designed to ensure that federal decision-makers thoroughly
19  evaluate and address the impacts of their proposed actions on historic properties prior to
20  taking final action.

21      33.   The NHPA "take into account" or "Section 106" process requires federal
22  agencies involved in undertakings to make a reasonable and good faith effort to identify
23  and disclose historic properties within affected areas, evaluate the potential adverse
24  effects of the federal undertaking to the historic properties, and seek ways to avoid,
25  minimize, or mitigate any adverse effects to the historic properties.  36 C.F.R. §§ 800.4-
26  800.6.  Throughout all stages of the Section 106 process, the applicable federal agency
27  must consult with federally-recognized Indian tribes that attach religious and cultural
28  significance to Traditional Cultural Properties that may be affected by an undertaking,

and may consult with other tribes, organizations, and persons with an interest in the undertaking "due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties." *Id.* at §§ 800.2(c)(2)(ii), 800.2(c)(5), 800.3(f)(2), 800.4(a), 800.5(c), 800.6(a).  The entities consulted with are "consulting parties." *Id.* at § 800.2(c).

34.     The Section 106 process also requires the action agency to seek and consider the views of the public regarding the undertaking and its effects on historic properties.  *Id.* at § 800.2(d).

## *ADMINISTRATIVE PROCEDURE ACT*

35.     The Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, provides for judicial review of final agency action.

36.     Under the authority of the APA, a reviewing court must hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).  A reviewing court must also set aside agency action, findings, and conclusions found to be without observance of procedure required by law.  5 U.S.C. § 706(2)(D).  A reviewing court shall compel agency action unlawfully withheld or unreasonably delayed.  5 U.S.C. § 706(1).

## **FACTUAL AND PROCEDURAL ALLEGATIONS**

## *THE CALIFORNIA CONDOR*

37.     The California condor (*Gymnogyps californianus*) is the largest bird in North America, weighing as much as twenty-five pounds, standing as tall as four and a half feet, and soaring on wings more than nine feet wide.  These majestic birds once dominated Western skies from Canada to Mexico, from the Pacific coast as far inland as Utah, but their range has been greatly reduced to parts of Central and Southern California, with experimental, reintroduced population in northern Arizona/southern Utah and Baja California.

38.     Condors are obligate scavengers, meaning they feed only on carrion—

---

carcasses of animals—and do not hunt.  Condors prefer the carcasses of large mammals such as deer and whales, but are also known to eat the carcasses of smaller animals such as California ground squirrels.

39.   California condors live in rocky, forested regions including canyons, gorges and mountains.  Condors soar on wind currents to heights of up to 15,000 feet and travel up to 150 miles a day in search of food, searching for carcasses by sight, not smell.

40.   Habitat loss and destruction, hunting, lead poisoning, decrease in food source, the capturing of live birds and eggs, collisions with power lines and wind turbines, and other human-caused assaults have decimated the species.  When wild California condors populations were first measured in 1968, only 50-60 birds remained.

41.   The California condor was listed as endangered under the 1966 Endangered Species Preservation Act—the precursor to the ESA—in 1966.  80 Stat. 926, 926-930, P.L. 89-669, Oct 15, 1966.  The next year, the Secretary of the Interior approved the first list of endangered species and the California condor was among the first 78 species listed as endangered.  32 Fed. Reg. 4001.

42.   In 1973, the ESA replaced the Endangered Species Preservation Act.  Species listed under the prior act, including the California condor, were grandfathered in as listed species under the ESA.  Despite the listing of the condor as endangered, by 1982 there were only 22 California condors left in the wild.

43.   In 1982, fearing the condor's imminent extinction, the Service began capturing all wild condors.  Upon the removal of the last condor, the species became extinct in the wild.  A captive breeding program began shortly thereafter with the first birds being released back into the wild in 1992.

44.   With the captive breeding and reintroduction program, condor numbers have slowly increased.  As of December 2017, there were 290 California condors in the wild, including 90 in Central California, 80 in Southern California, 82 in northern Arizona and southern Utah, and 38 in Baja California.  An additional 173 condors were in captivity.

---

45.    The condor's gradual recovery has required significant and ongoing human intervention and management, including the repeated recapture of condors for treatment for lead poisoning and the continued release of captive-born birds.

46.    California condors are fully-protected birds under California law (Cal. Fish & Game Code § 3511(b)(5)), and may not be taken at any time except for certain narrow exceptions such as for "necessary scientific research, including efforts to recover fully protected, threatened, or endangered species" (*id*. at §3511(a)(1)), or if take is authorized under an approved Natural Communities Conservation Plan ("NCCP") (*id*.; *see* Fish & Game Code § 2835.)  There is no approved NCCP that would cover take of condor for any of the Tejon Ranch activities.

47.    California condors continue to die of lead poisoning from feeding on the carcasses of animals contaminated with the lead fragments of hunters' bullets and shot, although state legislation banning the use of lead bullets in the California counties home to critical habitat has reduced condor mortality.   Between 1992 to 2012, 123 condors died of lead poisoning.  In 2013, at least 10 condors died of lead poisoning and 57 were treated for lead toxicosis.  In 2016, one condor died was confirmed dead from lead poisoning, and 15 were treated.

48.    In 1976, the Service designated 570,400 acres as critical habitat for the condor.  41 Fed. Reg. 41914 (September 24, 1976.)  The designation created nine geographically distinct critical habitat units spread throughout the condor's "U" shaped range at the base of California's Central Valley.  One of these units—the Tejon Ranch Critical Habitat Unit ("Tejon Ranch Unit")—covers 134,871 acres of Tejon Ranch's 270,365 "land, water, and airspace" acres.  41 Fed. Reg. 41914 (amended with no changes in 42 Fed. Reg. 47840-45).  The critical habitat designation identified the Tejon Ranch Unit as "critical for feeding and related activities" and further explained that the unit "is very important because it contains the only significant feeding habitat remaining in close proximity to the Sespe-Piru Condor nesting area."  41 Fed. Reg. 41914.

49.    The California condor holds great religious and cultural significance to

tribes with ancestral lands within and adjacent to Tejon Ranch, in particular the Chumash and the Kitanemuk and Yowlumne Tejon Indians.  Like the status of the bald eagle in other indigenous cultures, the practice of the Chumash and the Kitanemuk and Yowlumne Tejon Indians religions, cultural traditions, connection to their ancestors, and cultural ceremonies requires access to and seeing the California condors in specific locations and sacred sites, including at ancestral burial sites.  Both the Chumash and the Kitanemuk and Yowlumne Tejon Indians, in continuation of the traditional cultural and religious practices of their ancestors, honor the condor through ceremonial dance, other ceremonial and cultural practices, and through oral history.  Due to the precipitous decline of the species, practitioners have had difficulty collecting condor feathers for use in condor dances, and other sacred religious ceremonies and cultural practices, including those connecting them to their ancestors.  The condor and condor habitat play a vital role in these communities' historically-rooted beliefs, customs, and practices and, as such, are Traditional Cultural Properties.

50.     The presence of the condor and condor habitat on, around, and over the lands covered by the TUMSHCP, which include Chumash and Kitanemuk and Yowlumne Tejon Indians' current and traditional territories, burial sites, and sacred cultural and religious landscapes and viewscapes, allows and is necessary for these tribes to connect with their ancestors, is necessary for these tribal members to continue honoring and connecting with the condor in ceremonies and traditions, and is necessary for these tribes' cultural and ceremonial use of sacred sites which are dependent on the condor's presence on the sites or flying overhead.

**TEJON RANCH**

51.     The area now known as Tejon Ranch is located in Kern and Los Angeles counties, in and around the Tehachapi Mountains of California.  Tejon Ranch contains a great diversity of landforms, topography, habitats, wildlife, and plant communities.  In addition to the California condor, Tejon Ranch provides habitat for the endangered southwestern willow flycatcher (*Empidonax traillii extimus*), the endangered least Bell's

---

Second Amended Complaint for Declaratory and Injunctive Relief                    16

vireo (*Vireo bellii pusillus*), the threatened western yellow-billed cuckoo (*Coccyzus americanus occidentalis*), and several other species that are not protected under the ESA but are "covered" species under the TUMSHCP.

52.    Prior to the arrival of non-native peoples, the region is known to have been occupied by numerous Native American tribes such as the Kitanemuk, Yowlumne Yokuts, Tulamni Yokuts, Hometwoli Yokuts, Interior Chumash, Tataviam, and Kawaiisu tribes, and was a travel and trade route for a multitude of coastal Chumash tribes, bands, and clans that occupied areas in the region when coming through.

53.    The Chumash people resided in villages, conducted ceremonies and cultural practices at sacred sites, and buried their dead in and around the present Tejon Ranch area for over 10,000 years.  The Kitanemuk and Yowlumne Tejon Indians were likewise early residents of the Tehachapi Mountains and the Antelope Valley, including the lands covered by the TUMSHCP.

54.    During the California gold rush, United States officials tasked Lieutenant Edward Fitzgerald Beale with removing native people from their land to facilitate the arrival of settlers into the area.  In 1851, a temporary camp was set up at Tejon Pass for the execution of a treaty with native peoples in the region, known as Treaty D.  Lt. Beale brought in tribal representatives from the region, including the Tejon Ranch, Lake Isabella, Castec, Rancho San Emigdio, Buena Vista Lake, Kern Lake, Kern River, and Grapevine areas, to agree under the treaty to vacate the majority of the mountainous inland tribal homelands in exchange for the promise of goods, annuities, and reservation land in the Central Valley.  In 1852, Lt. Beale established a reservation for all those native people represented as signatory parties to Treaty D, including those originally from the Tejon Ranch lands, further facilitating the removal of the historic occupants of the Tejon Ranch.  The reservation was named the Sebastian Indian Reservation after William King Sebastian, then chairman of the Senate Committee on Indian Affairs. Treaty D, also known as the Tejon Treaty, was never ratified, yet the land was not returned, the reservation was soon returned to private, non-tribal ownership, and the

---

1  reservation occupants were again forced to leave.

2      55.    In 1858, the Lands Commission ratified claims to Tejon Ranch land based

3  upon earlier Mexican land grants.  The tribes were stripped of their rights to the

4  Sebastian Reservation and again displaced.  Beale bought numerous parcels from those

5  declared to be owners by the Lands Commission until he owned the whole of what is

6  now know as Tejon Ranch.  He began ranching the land in the late 1800s and continued

7  to expel the native inhabitants who had been deprived of their rightful ancestral land

8  through his political maneuvering.

9      56.    In 1912, a group of businessmen purchased Tejon Ranch.  In 1936, ranch

10  ownership was transferred to Tejon Ranch Company.  Tejon Ranch Company is now

11  operated as Delaware corporation, publically traded on the New York Stock Exchange.

12  Tejon Ranchcorp, a wholly owned subsidiary of Tejon Ranch Company and a California

13  corporation, holds title to the Tejon Ranch lands with the exception of the lands

14  comprising the Tejon Industrial Complex.

15      57.    In February 2003, the adult condor known as AC-8 was shot and killed on

16  Tejon Ranch lands during a hunt authorized by Tejon Ranch Company.  AC-8 was first

17  observed in the 1960s nesting within Tejon Ranch, was one of the last remaining

18  condors born in the wild prior to 1982, and was the first of the wild-born condors to be

19  re-released to the wild in 2000.  The Service considered AC-8 to be a mentor bird for

20  captive-raised condors that had been released.  Plaintiff Delia Dominguez attended the

21  federal court hearing for the hunter who shot AC-8, and sought the release of AC-8's

22  remains to the Kitanemuk and Yowlumne Tejon Indians for the use of AC-8's feathers

23  in traditional religious and cultural ceremonies and regalia, for sharing with other tribes

24  for use in traditional religious and cultural ceremonies and regalia, and to provide the

25  condor with a ceremonial burial.  In meetings with Service staff and other interested

26  persons regarding the fate of AC-8's remains, Ms. Dominguez emphasized the cultural

27  and religious importance of condors to the Kitanemuk and Yowlumne Tejon Indians.

28  While AC-8's remains were ultimately turned over to a federally-recognized tribe, the

1 Kitanemuk and Yowlumne Tejon Indians were qualified to receive the remains based on

2 the Tribe's special connection to the condor rooted in religious and cultural practices.

3     58.    Tejon Ranch remains vital to the Southern California condor population due

4 to several unique characteristics, demonstrated by the fact that most of the condors in

5 Southern California have been documented foraging (searching for food and feeding) at

6 the Tejon Ranch Unit.  Livestock grazing operations, native ungulates, and the hunting

7 of non-native game species provides an abundant food supply.  The condors are able to

8 ride the area's strong and reliable winds to travel the long distances required to visually

9 locate carcasses and, the area's abundance of other scavengers, including vultures and

10 eagles, helps the condors forage.  The area's long history of isolation has kept it largely

11 free from detrimental human influences associated with urbanization making suitable

12 overnight roosting locations and foraging grounds especially attractive to condors.

13 Accordingly, in its present, undeveloped state, the Tejon Ranch Unit demonstrates very

14 high levels of condor activity.

15     59.    The Tejon Ranch Unit has become even more critical to the survival and

16 recovery of the California condor as urban development, oil and gas extraction, farming,

17 and wind energy development elsewhere have transformed formerly suitable foraging

18 habitat into areas that may not be compatible with California condor recovery.

19 **THE TUMSHCP AND TEJON MOUNTAIN VILLAGE**

20     60.    In 1997, Tejon Ranch Company filed a lawsuit against the Service seeking

21 to halt the release of California condors near Tejon Ranch and to have any released

22 condors in California be classified as an experimental population under ESA Section

23 10(j).  In or around 2002, the Service and Tejon Ranch Company began negotiating the

24 agreement that culminated in the TUMSHCP.  Under the terms of this deal, which

25 remained under seal until 2009, Tejon Ranch Company dismissed this lawsuit in 2014

26 based on the Service's 2013 approval of the TUMSHCP and issuance of the ITP in a

27 form acceptable to Tejon Ranch Company.

28     61.    In 2005, Tejon Ranch Company, with the Service's technical assistance,

---

Second Amended Complaint for Declaratory and Injunctive Relief     19

began drafting the TUMSHCP in an effort to obtain an ITP for a variety of protected species for the "covered lands"—141,886 of Tejon Ranch's 270,365 acres. The covered lands include Tejon Ranch Company's Tejon Mountain Village luxury resort residential and commercial development project, which would result in 5,533 acres of permanent ground disturbance and up to an additional 1,773 acres of vegetation clearing within a total development envelope of 8,817 acres.

62.     Anticipated buildout of Tejon Mountain Village would include up to 3,450 residences, 160,000 square feet of commercial development, 750 hotel rooms, and 350,000 square feet of support uses, as well as two golf courses, an equestrian center, and supporting roads, infrastructure, and utilities. Kern County approved a specific plan for Tejon Mountain Village in 2009, but building has not commenced.

63.     The Service released the draft TUMSHCP, draft environmental impact statement, and the proposed implementation agreement for the plan in February 2009. 74 Fed. Reg. 6050. In January 2012, the Service released a supplemental environmental impact statement for the plan. Plaintiffs submitted written comments on the TUMSHCP, environmental impact statement, and supplemental environmental impact statement.

64.     The Service initiated its Section 106 consultation process for the TUMSHCP in 2007. As part of this consultation process, the Service contacted over a dozen tribes and tribal representatives as consulting parties, including Plaintiff Delia Dominguez, "to ensure that the relevant Native American community had been given the opportunity to consult on the most current description of the undertaking," and to identify Traditional Cultural Properties that may occur in the project area. In public comments on the TUMSHCP, Plaintiff Wishtoyo specifically identified impacts to the Chumash peoples' cultural and religious practices from adverse localized impacts to the condor and its habitat from the Tejon Mountain Village project, and specified that the condor and its habitat should be analyzed and treated as Traditional Cultural Properties under the NHPA and included in the scope of the Service's NHPA consultation. Wishtoyo also submitted comments provided by Plaintiff Delia Dominguez during the

1  environmental review of the Tejon Mountain Village project that identified harm to her
2  and her Tribe's cultural and religious practices from localized impacts to the condor and
3  its habitat from the project, which accordingly should have been included in the scope of
4  the Service's NHPA consultation and analyzed as Traditional Cultural Properties under
5  the NHPA.  However, the Service refused to recognize condors or condor habitat as
6  Traditional Cultural Properties and therefore did not consult with consulting parties on
7  the TUMSHCP's effects on condors, condor habitat, or the resulting effects on
8  Traditional Cultural Properties, tribal cultural practices, tribal ceremonial practices, and
9  tribal religious practices.

10      65.    On April 26, 2013, the Service issued its final Biological Opinion for the
11  TUMSHCP.  The Biological Opinion concluded that, although condors currently use and
12  are likely to continue to use the Tejon Ranch Unit, the proposed activities on covered
13  lands within Tejon Ranch were not likely to jeopardize the existence or recovery of the
14  California condor.  The Service also concluded that the Tejon Mountain Village
15  development was not likely to destroy or adversely modify the condor's critical habitat,
16  despite the project's permanent elimination or modification of thousands of acres of
17  designated critical habitat.  Development of Tejon Mountain Village pursuant to the
18  TUMSHCP will result in the direct and indirect modification of approximately 12,000
19  acres of condor foraging habitat within the Tejon Ranch Unit.  In particular, buildout of
20  the Tejon Mountain Village project as planned, including grading, fill, construction, and
21  occupancy, will harm condors and permanently destroy or alter areas of condor habitat,
22  including ridgelines, outcroppings, trees, feeding and bathing sites, and other features,
23  that are Traditional Cultural Properties for the Kitanemuk and Yowlumne Tejon Indians
24  and Chumash people.  Buildout of the Tejon Mountain Village project will also
25  permanently deny condors access to areas that are a part of the cultural landscape for the
26  Kitanemuk and Yowlumne Tejon Indians and Chumash people, and permanently deprive
27  native peoples of cultural and religious practices associated with condors and condor
28  habitat, as well as permanently deprive native peoples of places to collect condor

Second Amended Complaint for Declaratory and Injunctive Relief                              21

feathers for cultural, religious, and ceremonial use.

66.     On April 29, 2013, the Service released its final Record of Decision for the TUMSHCP environmental impact statement and issued Tejon Ranchcorp a 50-year, renewable ITP for "approximately 145,000 acres of Tejon Ranchcorp lands in Kern County, California." The ITP authorized incidental take of four California condors as well as 12 other species associated with the proposed activities. The Record of Decision acknowledges that condors are "of significant cultural, religious and spiritual significance to Native Americans," but concludes that condors, as free-roaming animals, do not fit within the definition of "objects" that may qualify for the National Register, and therefore are not Traditional Cultural Properties. The Record of Decision also acknowledges that commenters, including Plaintiffs, requested that condors and the condor habitat in the TUMSHCP area be considered Traditional Cultural Properties. The Record of Decision further states that condor habitat in the project lands is not a Traditional Cultural Property, based on the Service's assertion that "no information was provided [to the Service] to support the link between a specific tribe and its use of a specific area in these lands as a TCP related to the California condor or otherwise." The Service concluded that the protection and management of condor foraging and roosting areas in most of the TUMSHCP area (outside the Tejon Mountain Village development area) would "help ensure the continued presence of the condor on these lands, which is of significant cultural, religious and spiritual significance to Native Americans." The Service thus approved the TUMSHCP without considering condors and condor habitat as Traditional Cultural Properties.

## CLAIM FOR RELIEF

### Violations of the NHPA and APA

67.     Plaintiffs hereby re-allege and incorporate by reference each and every allegation set forth in this Complaint as if set forth in full herein.

68.     The TUMSHCP is an "undertaking" of the Service pursuant to the NHPA.

69.     The Service violated the NHPA when it approved the TUMSHCP, issued

the ITP, and issued the Record of Decision without adequately taking into account, adequately evaluating, or attempting to mitigate the effects of these approvals on the California condor; condor nests; tribal cultural and tribal sacred landscapes, sites, burial grounds, and viewscapes, of which the cultural and religious function and significance to tribes are dependent on the presence of the condor; and/or condor habitat as Traditional Cultural Properties.  54 U.S.C. § 306108; 36 C.F.R. 800.4-800.6.

70.    The Service's approval of the TUMSHCP, issuance of the ITP, and adoption of the Record of Decision without consideration of the California condor; condor nests; tribal cultural and tribal sacred landscapes, sites, burial grounds, and viewscapes, of which the cultural and religious function and significance to tribes are dependent on the presence of the condor; and condor habitat as Traditional Cultural Properties was arbitrary, capricious, and not in accordance with law as required by NHPA.

71.    The Service's approval of the TUMSHCP, issuance of the ITP, and adoption of the Record of Decision without consultation with tribes and tribal representatives regarding the effect of the TUMSHCP on the California condor; condor nests; tribal cultural and tribal sacred landscapes, sites, burial grounds, and viewscapes, of which the cultural and religious function and significance to tribes are dependent on the presence of the condor; and/or condor habitat was arbitrary, capricious, and not in accordance with law as required by NHPA, and represents agency action unlawfully withheld in violation of the APA.

72.    In connection with its approval of the TUMSHCP, issuance of the ITP, and adoption of the Record of Decision, the Service failed to adequately identify and analyze other historic and cultural resources within the TUMSHCP area that are at risk due to the Tejon Mountain Village project despite the fact that the Service was aware of the details of at least 58 separate areas containing such resources.  Plaintiffs informed the Service of the State of California's comprehensive, three phase archaeological survey prepared as part of the California Environmental Quality Act review process for Tejon Mountain

Village.  That survey identified 58 distinct places of historic and cultural value, the majority which were places significant to the local Native American tribes, including the Chumash and Kitanemuk and Yowlumne Tejon Indians.  Among these known areas were sacred sites and burial grounds.  The Service knowingly and intentionally violated the NHPA when it failed to adequately identify and analyze the historic and cultural resources that it was aware of within the TUMSHCP area.

73.    For each of the above reasons, and others, the Service's approval of the TUMSHCP, ITP, and Record of Decision is arbitrary, capricious, and not in accordance with law as required by NHPA, its implementing regulations, and the APA, and is subject to judicial review thereunder.  5 U.S.C. §§ 701-706.

**PRAYER FOR RELIEF**

Plaintiffs request that this Court enter judgment providing the following relief:

1.    A judgment declaring that the Service violated the NHPA due to its failure to adequately take into account the effects of the Tehachapi Uplands Multiple Species Habitat Conservation Plan and Incidental Take Permit on Traditional Cultural Properties and failure to seek ways to avoid, minimize, or mitigate adverse effects to such properties, and that such failure is arbitrary, capricious, and not in accordance with procedures required by law pursuant to the APA, 5 U.S.C. §§ 701-706;

2.    A judgment declaring that the Service violated the NHPA due to its failure to adequately consult with consulting parties on condors and condor habitat as Traditional Cultural Properties, and that such failure is arbitrary, capricious, and not in accordance with procedures required by law pursuant to the APA, 5 U.S.C. §§ 701-706;

3.    A judgment declaring that the Service's approvals of the Tehachapi Uplands Multiple Species Habitat Conservation Plan, Biological

Opinion, Incidental Take Permit, and Record of Decision are unlawful based on the Service's violation of the NHPA;

4. A judgment declaring that the Service failed to comply with the requirements of the NHPA, and that such failure constitutes agency action unlawfully withheld as provided by Section 706(1) of the APA;

5. A judgment that the Service failed to comply with the requirements of the APA insofar as its failure to comply with the NHPA is arbitrary, capricious, not in accordance with procedures required by law, and constitutes agency action that is unlawfully withheld as provided by the APA, 5 U.S.C. §§ 701-706;

6. An order vacating and setting aside the Tehachapi Uplands Multiple Species Habitat Conservation Plan, Biological Opinion, Incidental Take Permit, and Record of Decision pending the Service's compliance with the NHPA;

7. An order enjoining the Service from issuing further permits and authorizations pursuant to the TUMSHCP pending the Service's compliance with the NHPA;

8. An award to Plaintiffs of their costs of litigation, including reasonable attorneys' fees as provided in the Equal Access to Justice Act and/or any other applicable law; and

9. Any other such relief as the Court deems just and proper.

///

Respectfully submitted this 30th day of October, 2019.


/s/ John Buse
John Buse
Lisa T. Belenky
John Rose
CENTER FOR BIOLOGICAL
DIVERSITY

Jason Weiner
WISHTOYO FOUNDATION

Attorney for Plaintiffs