FILED
CLERK, U.S. DISTRICT COURT

12/4/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_CW\_\_\_\_ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WISHTOYO FOUNDATION,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **UNITED STATES FISH AND WILDLIFE SERVICE,** *et al.*, <br><br> **Defendants.** | Case No.: CV 19-03322-CJC(ASx) <br><br> **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [Dkt. 84] AND GRANTING DEFENDANT'S AND DEFENDANT-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT [Dkts. 91, 92]** |

## I. INTRODUCTION

Plaintiffs Wishtoyo Foundation ("Wishtoyo"), Delia Dominguez ("Ms. Dominguez"), and the Center for Biological Diversity ("the Center") bring this action against Defendant United States Fish and Wildlife Service ("USFWS") and Defendant-Intervenors Tejon Ranchcorp and Tejon Mountain Village, LLP (collectively, "Tejon"). (Dkt. 31 [Second Amended Complaint, hereinafter "SAC"].) Before the Court is Plaintiffs' motion for summary judgment. (Dkt. 84 [hereinafter "P. Mot."].) The

USFWS and Tejon separately filed cross-motions for summary judgment. (Dkts. 91 [The USFWS's Cross-Motion for Summary Judgment, hereinafter "D. Mot."], 92 [Tejon's Cross-Motion for Summary Judgment.) For the following reasons, Plaintiffs' motion is **DENIED** and the USFWS's and Tejon's motions are **GRANTED**.[1]

## II. BACKGROUND

This case arises from the USFWS's alleged failure to adequately "take into account" the effects that the Tehachapi Uplands Multiple Species Habitat Conservation Plan ("TUMSHCP") would have on the California condor. Plaintiffs allege that the USFWS violated the National Historic Preservation Act ("NHPA"), 54 U.S.C § 306108, when it erroneously concluded that the California condor was not a "Traditional Cultural Property," as defined by NHPA, and failed to conduct an adequate impact and mitigation analysis on the condor's habitat. (P. Mot. at 8–9.)

### A. The California Condor

The California condor is the largest bird in North America. (Dkt. 85-1 [Defendant The USFWS's Statement of Genuine Facts, hereinafter "D. SUF"] ¶ 1.)[2] The condor's population has steadily declined through most of the twentieth century due to habitat loss, poaching, egg collection, lead poisoning, and other causes. (*Id.* ¶ 2.) The federal government has listed the condor as an endangered species since 1967 and in 1987 all remaining wild condors were brought into captivity. (*Id.* ¶¶ 3, 5.) After achieving a successful captive breeding program, the condor was reintroduced into the wild in 1992.

---

[1] Having read and considered the papers presented by the parties, the Court finds these matters appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearings set for December 7, 2020, at 1:30 p.m. are hereby vacated and off calendar.

[2] The USFWS filed a copy of the final administrative record with the Court. (Dkts. 61–81, 83 [hereinafter "AR"].)

(*Id.* ¶ 5.) As of 2011, there were 209 condors in the wild and another 182 in captivity. (*Id.*)

The California condor is of great religious and cultural significance to the Chumash, the Kitanemuk, and the Yowlumne Tejon Indians. (Dkt. 84-3 [Plaintiffs' Statement of Uncontroverted Facts] ¶¶ 4–5.) The presence of the condor on the lands covered by the TUMSHCP allows members of these tribes to connect with their ancestors and to continue to engage in cultural ceremonies and traditions which often use the condor's feathers. (*Id.* ¶¶ 6, 8–14.)

### B. Tejon Ranch

The dispute in this case arises from Defendant-Intervenor Tejon Ranchcorp's plans to develop part of Tejon Ranch. Tejon Ranch is approximately 270,000 acres of land in Los Angeles and Kern Counties in California, privately owned by the Tejon Ranch Company. (D. SUF ¶¶ 6, 15.) Approximately 128,000 acres within Tejon Ranch are designated as a critical habitat for the condor because the area serves as an important foraging habitat, though the condor does not nest there. (*Id.* ¶¶ 8–9.)

In the early 2000s, Tejon Ranch Company began working with the USFWS on the TUMSHCP, a plan that would authorize significant development of Tejon Ranch. (*See* AR 75:8305.) Drafts of the TUMSHCP and its accompanying environmental impact statement were released by the USFWS in 2009 and 2012. (D. SUF ¶¶ 25, 46.) The most significant proposed development is Tejon Mountain Village, a resort-based community which includes 3,450 residences, 750 hotel rooms, and two golf courses. (P. SUF ¶ 18.)

Between 2002 and 2013, the USFWS undertook a series of actions to ensure that the TUMSHCP complied with federal environmental statutes, including the NHPA. Section 106 of the NHPA requires federal agencies approving an "undertaking" to "take

into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. This "taking into account" process involves agencies identifying "historic properties" that could be affected by the undertaking and then consulting with various parties, including any Indian Tribe that "attaches religious and cultural significance" to the identified properties. *See* 36 C.F.R. § 800.4. Pursuant to the NHPA, the USFWS initiated the Section 106 consultation process in 2007 by contacting the Native American Heritage Commission ("NAHC") and area tribal representatives who could help the USFWS identify traditional cultural properties[3] ("TCP") that could be potentially impacted by the TUMSHCP. (D. SUF ¶¶ 23–24.) The NAHC informed the USFWS that its sacred-land file did not indicate the presence of Native American cultural resources in the immediate project area. (*Id.* ¶ 23.)

The USFWS conducted several archeological evaluations for sites within the planning area, in consultation with the State Historic Preservation Officer ("SHPO") as required by 36 C.F.R. § 800.4(d). (*Id.* ¶¶ 26–36.) It reached determinations that there was "no adverse effect" or "no historic properties affected" on sites that it evaluated. (*Id.*) The SHPO concurred in these determinations. (*Id.* ¶ 36.)

The USFWS issued several draft environmental impact statements and solicited input from local tribal representatives and the public. (*Id.* ¶¶ 39–46.) Its July 2012 outreach to tribal representatives described the results of USFWS's archeological studies and noted that "[n]o impacts to cultural resources are expected to occur because all projects are designed to avoid them or are subjected to site-specific mitigation measures." (*Id.* ¶ 44; *see* AR 38–54.) Following this outreach, USFWS received no indication of any

---

[3] A "traditional cultural property" is a historic property "that is eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." U.S. Dep't of the Interior, National Park Service, *National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties* at 1 (1998).

TCPs within the covered area.  (*Id.* ¶ 44.)  The USFWS also determined that the California condor did not fit within the NHPA's definition of "traditional cultural property" and that the development proposed would not "substantially affect the condor." (*Id.* ¶¶ 47–49, 53.)

On April 29, 2013, the USFWS approved the TUMSHCP and released its final Record of Decision for the TUMSHCP environmental impact statement.  (*Id.* ¶ 58.)  The approval was accompanied by an incidental take permit which authorized the "incidental take" of four California condors subject to Tejon's compliance with the TUMSHCP.  (*Id.* ¶¶ 10–14, 59.)

## III.  LEGAL STANDARD

Because the NHPA does not provide an independent basis for judicial review of agency actions, an aggrieved party must pursue its remedy under the Administrative Procedure Act ("APA").  *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005).  The APA authorizes judicial review of final agency actions "for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Final agency actions are actions which "mark the consummation of the agency's decisionmaking process," are not "merely tentative or interlocutory [in] nature," and determine "rights or obligations" or from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations and citations omitted).  An agency action or decision may be set aside if the court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and a court may "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1).  A court's inquiry must be "searching and careful," but the standard of review is ultimately narrow.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quotations and citations omitted).  "The standard of review is 'highly deferential, presuming the agency action to be valid and

affirming the agency action if a reasonable basis exists for its decision.'" *Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)).

## IV. ANALYSIS

Under the NHPA, a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5, 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5(c), 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e), 800.9(c). *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

Additional NHPA provisions apply to Indian tribes: "(A) Properties of traditional religious and cultural importance to an Indian tribe . . . may be determined to be eligible for inclusion in the National Register. (B) In carrying out its responsibilities under Section 106, a Federal Agency shall consult with any Indian Tribe . . . that attaches religious and cultural significance to properties described in Subparagraph (A)." 16 U.S.C. § 470a(d)(6).

Plaintiffs assert that the USFWS: (1) erred when it concluded that the condor and its habitat did not qualify as a TCP, (2) failed to investigate whether the condor's habitat could have been classified as a TCP, and (3) failed to adequately assess the TUMSHCP's mitigation measures.

//

//

### A. The Condor as a Traditional Cultural Property

Plaintiffs argue that the USFWS violated the NHPA when it found that the condor and its habitat did not qualify as a TCP. A historic property is defined as any "district, site, building, structure, or object included on, or eligible for inclusion on, the National Register." 54 U.S.C. § 300308. Plaintiffs assert that the condor may qualify as a historic property as an "object," primarily relying on *Dugong v. Rumsfeld*, 2005 WL 522106 (N.D. Cal. Mar. 2, 2005). The Court disagrees.

Though the Ninth Circuit has not addressed whether animals may qualify as a TCP, the Court finds the concurrence in *Center for Biological Diversity v. Esper* persuasive. 958 F.3d 895 (9th Cir. 2020). In *Esper*, an appeal related to *Dugong*, the concurrence concluded that the district court erred when it found that the dugong, a marine animal with a habitat in Okinawa, Japan, was "property" covered by the NHPA. *Id.* at 917–18 (Bea, J., concurring). It stated that "property" protected by the NHPA "is limited to a 'district, site, building, structure, or object,' or to items that meet the definitions of 'cultural heritage' or 'natural heritage' as the terms are defined in the United Nations World Heritage Convention." *Id.* at 917 (citations omitted) (Bea, J., concurring). Under this definition, protection is limited "to specific locations and to tangible, inanimate objects." *Id.* at 918. The concurrence reasoned that "[a]pplying *noscitur a sociis*, 'object,' as part of a list containing 'district, site, building, [and] structure,' does not include animals." *Id.* (quoting 54 U.S.C. § 300308). Similarly, the Department of Interior's regulations defining an "object" for the National Register provide examples which are all inanimate objects and no animals or wildlife are listed on the National Register. *Id.* (citing 36 C.F.R. § 60.3(j)).

The USFWS rules to which Plaintiffs cite support only that the condor's habitat may be considered a TCP, not the condor itself. Plaintiffs misleadingly suggest that a 2009 USFWS regulation regarding eagle permits "observes that eagles, eagle nests, and 'other areas where eagles are present' qualify as TCPs and as potential historic properties under the NHPA." (P. Mot. at 20.) The regulation, however, states only that "eagles *nests* and *other areas* where eagles are present" are sites which may qualify as TCPs. Eagle Permits; Take Necessary To Protect Interests in Particular Localities, 74 Fed. Reg. 46,836, 46,873–74 (Sept. 11, 2009) (emphasis added). The final rule concludes that "[t]he *areas* where eagles would be taken" may be regarded as TCPs and that taking "one or more eagles from a TCP area could potentially be considered an adverse effect to the TCP." *Id.* at 46844 (emphasis added). This regulation only refers to "areas" or "nests" as a potential TCPs—not the eagle itself—which supports the conclusion that protected property under the NHPA includes only inanimate objects or locations, not animals. That an animal species is a "highly significant species for Native American culture and religion" . . . supports only that an animal species "might be viewed as contributing elements to a TCP," not a TCP in and of itself. *See id.*

### B. The Condor Habitat

The USFWS complied with its obligation under the NHPA to make a reasonable and good-faith effort to identify historic properties and evaluate their significance by applying the National Register criteria. Plaintiffs' assertion that the USFWS failed to investigate whether the condor habitat could be classified as a TCP belies the undisputable facts in the administrative record.

After soliciting input from area tribal representatives, conducting archeological examinations of the area, and addressing comments from Plaintiffs—including comments concerning the condor and its habitat, the USFWS issued a final environmental impact


statement in October 2012. (D. SUF ¶¶ 37–45.) It explained that "general statements that the presence of the condor in the area is important to [an area tribe], do not make the ranch or the Covered Lands eligible for listing as a sacred site or a TCP" because those "classifications require eligibility criteria, including geographic specificity as further set forth in the National Park Service NHPA guidance document, Bulletin 38, Guidelines for Evaluating and Documenting Cultural Properties (National Park Service 1998)." (*Id.* ¶¶ 46, 48.) The USFWS relayed these findings to the SHPO, which included Plaintiffs' comments regarding the condor. (*Id.* ¶¶ 50–52.)

The USFWS reasonably concluded that the condor habitat in the project area, as identified by Plaintiffs, is not eligible for listing on the National Register. To be eligible for listing as a district, the area under consideration must have "geographical boundaries" that are "based upon a shared relationship among the properties constituting the district" and that "distinguish[]" it from the surroundings. (AR 4478:85870); *see also Pueblo of Sandia v. United States*, 50 F.3d 856, 860–61 (10th Cir. 1995) (agency needed to consider whether an identified canyon containing several sites important to the Pueblo tribe could be considered a traditional cultural district). The eligibility criteria require some level of detail of identifiable and distinct features which make a particular area significant. *See Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223, 1232 (9th Cir. 1999) ("That important things happened in a general area is not enough to make the area a 'site.'").

Plaintiffs' comments provided no geographic reference, boundary, or any other identifiable or distinct features, (*see* AR 37, 57:7992–8001), and the USFWS's investigation revealed nothing which would "support the link between a specific tribe and its use of a specific area in these lands as a TCP related to the condor, or otherwise," (AR 74:8164). The USFWS properly noted that the "tribal groups that are culturally affiliated with the [area] are the best source of information about TCPs that may occur in

the area." (*Id.* at 8165.) None of these tribal groups indicated that TCPs occurred in the area, (*id.*), which indicates that the USFWS's determination that no historic properties were affected was reasonable. *See Nw. Ecosystem All.*, 475 F.3d at 1140. Furthermore, the USFWS, by submitting these findings and comments to the SHPO who did not respond, fulfilled its obligations under Section 106. *See* 36 C.F.R. § 800.4(d)(1)(i) (if the SHPO does not object within 30 days of receipt of an adequately documented finding, "the agency['s] . . . responsibilities under section 106 are fulfilled").

### C. Mitigation Measures

Plaintiffs argue that the USFWS did not meet its obligations under the NHPA because "it ignored critical input as to the impact and suitability of mitigation measures for TCPs from the local" tribal stakeholders when it came to a "no adverse effect" determination regarding thirteen TCPs. (P. Mot. at 25.)

An adverse effect results when "an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). For archeological resources that are below ground, preservation in place can ensure that the qualifying characteristics remain unaltered. *See id.* § 68.3(a)(8). Plaintiffs raise particular concern with the USFWS's authorization of the "cap and fill" method to preserve seven of the thirteen identified TCPs. (P. Mot. at 29–30.) But "cap and fill" is a recognized method for achieving preservation in place. *See* 14 Cal. Code. Reg. 15126.4(b)(3)(B) (discussing measures that can achieve preservation in place); (*see also* AR 23:2995 [SHPO concurring in no adverse effect determination where prehistoric village site was to be preserved in place by cap and fill method]). The USFWS's archeological surveys also identified a number of other potential mitigation measures in

addition to the "cap and fill" method. (*See* AR 18, 22, 26–27, 36, 74 [consultations]; AR 1, 2, 13, 19, 21, 24–25 [archeological surveys].) As previously noted, the USFWS consulted with the SHPO and provided the SHPO with the results and recommendations of the archeological surveys. SHPO's concurrence with the USFWS's mitigation recommendations supports that USFWS's determination was reasonable. *See Pueblo of Sandia*, 50 F.3d at 858.

Plaintiffs' assertion that the USFWS "ignored" tribal input is unsupported by the record. While an agency must "consider" the views provided by consulting parties and the public in assessing adverse effects, it need not adopt them. *See* 36 C.F.R. § 800.5(a). The USFWS considered Ms. Dominguez's—and other tribal commentators'—views as submitted with Wishtoyo's comment letters on the environmental impact statement. (*See* AR 33:7126 [USFWS response noting that Wishtoyo "attached a letter from Delia Dominguez regarding cultural resource issues" and that the USFWS addressed those concerns in a master response]; *id.* at 7215–19 [master response addressing concerns].) That the USFWS did not follow all these suggestions does not mean it did not consider them.

Plaintiffs also argue that instead of separately analyzing the adequacy of these mitigation measures, the USFWS improperly "summarized and lumped together all the avoidance and mitigation measures it authorizes for all the Projects TCPs without the requisite analysis." (P. Mot. at 29.) However, they offer no law which requires USFWS to conduct its analysis with that level of specificity. For a finding of "no adverse effect," the regulations require continuing consultation, giving notice of the finding, and an opportunity to lodge disagreement. *See* 36 C.F.R. § 800.5(b)–(c). The USFWS followed the requisite process, and though it provided Ms. Dominguez with notice of its findings, (*see* AR 43, 63), Ms. Dominguez did not request to be a consulting party, nor did she respond to express disagreement with the finding. The USFWS properly considered

tribal comments and reached a reasonable conclusion regarding the TCPs. Its actions and decisions were not arbitrary, capricious, or an abuse of discretion, nor were they otherwise not in accordance with the law.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is **DENIED** and the USFWS and Tejon's motions for summary judgment are **GRANTED**. A judgment consistent with this order will be issued concurrently herewith.

DATED: December 4, 2020

HON. CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE